## EXHIBIT A

**Purchase Agreement**

DM3\8890762.9

*Execution Version*

ASSET PURCHASE AGREEMENT

by and between

HAMON RESEARCH-COTTRELL, INC.,

SELLER

and

THE BABCOCK & WILCOX COMPANY,

BUYER

DATED AS OF JULY 27, 2022

DM3\8893399.1

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "***Agreement***"), dated as of July 27, 2022, is entered into by and between Hamon Research-Cottrell, Inc., a Delaware corporation ("***Seller***"), and The Babcock & Wilcox Company, a Delaware corporation, or a designated Affiliate (as defined below) thereof (collectively, "***Buyer***").

WHEREAS, Seller commenced a voluntary case (the "***Bankruptcy Case***") under title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "***Bankruptcy Code***"), in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") on April 24, 2022 (the "***Petition Date***");

WHEREAS, Seller wishes to sell and assign to Buyer, and Buyer wishes to purchase and assume from Seller, certain specified assets and certain specified liabilities of Seller, all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with sections 105, 363, and 365 and other applicable provisions of the Bankruptcy Code;

WHEREAS, the Purchased Assets (as defined below) and Assumed Liabilities (as defined below) are assets and liabilities of Seller that are to be purchased by and assigned to Buyer pursuant to the Sale Order (as defined below), free and clear of all Encumbrances (as defined below), all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with the applicable provisions of the Bankruptcy Code;

WHEREAS, the transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court, all as more specifically provided in this Agreement, in accordance with sections 105, 363 and 365 of the Bankruptcy Code and other applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and the Bidding Procedures Order (as defined below); and

WHEREAS, Seller and Buyer have negotiated in good faith and at arm's length for the purchase and sale of the Purchased Assets, the assumption of certain Assumed Liabilities associated therewith, subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

The following terms have the meanings specified or referred to in this Article I:

"***Action***" means any Claim (as defined in this Section), action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"*Affiliate*" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"*Agreement*" has the meaning set forth in the preamble.

"*Allocable Consideration*" has the meaning set forth in Section 2.6.

"*Allocation Schedule*" has the meaning set forth in Section 2.6.

"*Alternative Transaction*" means any transaction or series of related transactions (other than pursuant to this Agreement), whether effectuated pursuant to a merger, consolidation, tender offer, exchange offer, share exchange, amalgamation, stock acquisition, asset acquisition, business combination, restructuring, recapitalization, liquidation, dissolution, joint venture or similar transaction, whether or not proposed by Seller, pursuant to which Seller sells, transfers, leases or otherwise disposes of, directly or indirectly, including through an acquisition, asset sale, stock sale, purchase, merger, reorganization, recapitalization or other similar transaction with or involving any equity securities in Seller or other interests in the Purchased Assets, including a stand-alone plan of reorganization, plan of liquidation, or refinancing, any material portion or all of the Purchased Assets (or agrees to any of the foregoing) in a transaction or series of transactions to a party or parties other than Buyer or its Affiliates.

"*Ancillary Documents*" means the Bill of Sale, the Assignment and Assumption Agreement, the Confidentiality Agreement, and the other agreements, instruments and documents required to be or otherwise delivered in connection with the transactions contemplated herein.

"*Assigned Contracts*" has the meaning set forth in Section 2.1(b).

"*Assignment and Assumption Agreement*" has the meaning set forth in Section 3.2(a)(iii).

"*Assignment Effective Date*" has the meaning set forth in Section 6.13(a).

"*Assumed Liabilities*" has the meaning set forth in Section 2.3.

"*Auction*" means an auction conducted by Seller in accordance with the Bid Procedures and Bidding Procedures Order.

"*Back-Up Bid*" has the meaning set forth in the Bid Procedures.

"*Back-Up Bidder*" has the meaning set forth in the Bid Procedures.

"*Bankruptcy Case*" has the meaning set forth in the Recitals.

"*Bankruptcy Code*" has the meaning set forth in the Recitals.

"***Bankruptcy Court***" has the meaning set forth in the Recitals.

"***Bankruptcy Rules***" has the meaning set forth in the Recitals.

"***Bid Procedures***" means the bidding procedures approved by the Bankruptcy Court pursuant to the Bidding Procedures Order for purposes of seeking bids for the purchase of the Purchased Assets.

"***Bidding Procedures Order***" means an order of the Bankruptcy Court that, among other things, establishes a date by which qualified bids meeting the requirements approved in the Bidding Procedures Order must be submitted by bidders, and establishes procedures for the bidding and Auction process.

"***Bill of Sale***" has the meaning set forth in <u>Section 3.2(a)(ii)</u>.

"***Books and Records***" has the meaning set forth in <u>Section 2.1(f)</u>.

"***B. Riley***" means B. Riley Securities, Inc., the duly appointed investment banker for the Seller.

"***B. Riley Interests***" means the ownership and management interests that B. Riley has with the Buyer as disclosed more fully in the Declaration of Perry M. Mandarino, senior managing director of B. Riley, as annexed to the Application to retain B. Riley Securities, Inc. as investment banker to the debtors (Bankruptcy Court Docket No. 128).

"***Business Day***" means any day except Saturday, Sunday or any other day on which commercial banks located in New York, New York are authorized or required by Law to be closed for business.

"***Buyer***" has the meaning set forth in the preamble.

"***Buyer Closing Certificate***" has the meaning set forth in <u>Section 7.3(c)</u>.

"***Claim***" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

"***Closing***" has the meaning set forth in <u>Section 3.1</u>.

"***Closing Date***" has the meaning set forth in <u>Section 3.1</u>.

"***Code***" means the Internal Revenue Code of 1986, as amended.

"***Company Used Intellectual Property***" means all of Seller's right, title and interest in (a) Intellectual Property owned, used or held for use by Seller and (b) all Intellectual Property owned or controlled by a Third Party and used or held for use in connection with the Purchased Assets (including any such interests and rights pursuant to any Assigned Contract), including, in each case, the Intellectual Property listed in <u>Schedule 4.8</u>.

"***Confidentiality Agreement***" means the Confidentiality Agreement between Seller and Buyer dated as of July 7, 2022.

3

"***Contract & Cure Schedule***" has the meaning set forth in <u>Section 6.13(a)</u>.

"***Contracts***" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures, agreements, franchises, warranties, guaranties, bonds, instruments, consensual obligations, and all other agreements, commitments and legally binding arrangements, whether written or oral, to which Seller is a party.

"***Correspondence***" has the meaning set forth in <u>Section 2.1(g)</u>.

"***Cure Claims***" means claims for cure with respect to executory contracts or unexpired leases under Section 365(b)(1)(A) of the Bankruptcy Code, as may be adjusted pursuant to <u>Section 6.13</u>.

"***Cure Claims Cap***" has the meaning set forth in <u>Section 2.8</u>.

"***Default***" means (i) a violation, breach, or default, (ii) the occurrence of an event that, with the passage of time, the giving of notice or both, would constitute a violation, breach, or default, or (iii) the occurrence of an event that, with or without the passage of time, the giving of notice or both, would give rise to a right of damages, specific performance, termination, cancellation, renegotiation, or acceleration (including the acceleration of payment).

"***Deposit***" has the meaning set forth in <u>Section 2.5(b)</u>.

"***Dollars***" or "***$***" means the lawful currency of the United States.

"***Encumbrance***" means any charge, Claim (whether known or unknown), community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, mortgage, easement, encroachment, encumbrance, right of way, right of first refusal, other interest of any kind, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"***Escrow***" has the meaning set forth in <u>Section 2.5(b)</u>.

"***Escrow Holder***" has the meaning set forth in <u>Section 2.5(b)</u>.

"***Excluded Assets***" has the meaning set forth in <u>Section 2.2</u>.

"***Excluded Contracts***" has the meaning set forth in <u>Section 2.2(b)</u>.

"***Excluded Liabilities***" has the meaning set forth in <u>Section 2.4</u>.

"***Existing Insurance Policies***" has the meaning set forth in <u>Section 4.5</u>.

"***Final Order***" means an order of the Bankruptcy Court or other court of competent jurisdiction: (i) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all respects without the possibility for further

4

appeal or rehearing thereon; (ii) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (iii) as to which no stay is in effect; provided, however, that the filing or pendency of a motion under Bankruptcy Rule 9024(b) shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within fourteen (14) calendar days of the entry of the order at issue. In the case of (i) the Sale Order, a Final Order shall also consist of an order as to which an appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been filed, but as to which Buyer and Seller mutually elect to proceed with the Closing, and (ii) any other order that is required hereunder to be a Final Order, a Final Order shall also consist of an order as to which an appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been filed, but as to which Buyer and Seller mutually elect to proceed.

"*Governmental Authority*" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any taxing authority, or any arbitrator, court or tribunal of competent jurisdiction.

"*Governmental Authorization*" means any approval, consent, ratification, waiver, license, permit, registration, certificate, variance or other authorization issued or granted by any Governmental Authority.

"*Initial Deposit*" has the meaning set forth in Section 2.5(b).

"*Insurance Proceeds*" has the meaning set forth in Section 2.1(i).

"*Intellectual Property*" means any and all rights in, arising out of, or associated with any of the following in any jurisdiction throughout the world: (i) issued patents and patent applications (whether provisional or non-provisional), including divisionals, continuations, continuations-in-part, substitutions, reissues, reexaminations, extensions, or restorations of any of the foregoing, and other Governmental Authority-issued indicia of invention ownership (including certificates of invention, petty patents, and patent utility models) ("*Patents*"); (ii) trademarks, service marks, brands, certification marks, designs, logos, trade dress, trade names, brand names, certification marks, corporate names, emblems, signs or insignia, slogans, and other similar indicia of source or origin, together with the goodwill connected with the use of and symbolized by, and all registrations, applications for registration, and renewals of, any of the foregoing (including any intent to use applications, supplemental registrations and any renewals or extensions of any of the foregoing) ("*Trademarks*"); (iii) copyrights and works of authorship, whether or not copyrightable, and all registrations, applications for registration, and renewals of any of the foregoing ("*Copyrights*"); (iv) internet addresses, internet domain names and social media accounts or user names (including "handles"), all associated web addresses, URLs, websites and web pages, social media sites and pages, and all content and data thereon or relating thereto, whether or not Trademarks or Copyrights have been issued with respect thereto; (v) mask works, and all registrations, applications for registration, and renewals thereof; (vi) industrial designs, and all Patents, registrations, applications for registration, and renewals thereof; (vii) trade secrets,

DM3\8893399.1

know-how, inventions (whether or not patentable), discoveries, improvements, technology, business and technical information, databases, data compilations and collections, tools, methods, processes, techniques and all rights therein ("***Trade Secrets***"); (viii) computer programs, operating systems, applications, source code, object code, application programming interfaces, data files, databases, protocols, specifications, accounting software and programs, historical accounting, and other documentation thereof, in whatever form ("***Software***"); and (ix) all other intellectual or industrial property and proprietary rights.

"***Inventory***" has the meaning set forth in Section 2.1(a).

"***Key DAC Personnel***" has the meaning set forth in Section 7.2(f).

"***Law***" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"***Liabilities***" means any and all Claims, debts, liabilities and other legally enforceable obligations of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise.

"***Order***" means any judgment, order, writ, decree, injunction or other determination whatsoever of any Governmental Authority of competent jurisdiction or any other entity or body whose finding, ruling or holding is legally binding or is enforceable as a matter of right (in any case, unless otherwise indicated, whether preliminary or final).

"***Ordinary Course***" means the ordinary course of business following the Petition Date consistent with recent past custom and practice, subject to any Orders of the Bankruptcy Court and Seller's status as, and maintenance of its business as, a debtor-in-possession.

"***Outside Date***" means August 22, 2022, unless extended in writing by Buyer and Seller.

"***Person***" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"***Petition Date***" has the meaning set forth in the Recitals.

"***Pre-Closing Tax Period***" means any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

"***Premises***" means the location of the Seller's business and any location where the Seller maintains the Purchased Assets.

"***Privileged Communications***" means any records, information, ledgers, files, invoices, documents, work papers, work product, drafts, presentations, analysis, correspondence, summaries, or similar items that, in whole or part, constitutes privileged communications between Seller and Seller's counsel or other professional advisors.

"***Purchase Price***" has the meaning set forth in Section 2.5(a).

"***Purchased Assets***" has the meaning set forth in <u>Section 2.1</u>.

"***Real Property***" has the meaning set forth in <u>Section 2.1(d)</u>.

"***Representative***" means, with respect to any Person, any and all directors, managers, officers, employees, consultants, financial advisors, counsel, accountants and other agents or representatives of such Person.

"***Sale Documents***" means this Agreement and the Ancillary Documents.

"***Sale Hearing***" has the meaning set forth in the Bid Procedures.

"***Sale Order***" has the meaning set forth in <u>Section 6.11(b)</u>.

"***Seller***" has the meaning set forth in the preamble.

"***Seller Closing Certificate***" has the meaning set forth in <u>Section 7.2(d)</u>.

"***Seller's Knowledge***" or any other similar knowledge qualification means the actual knowledge of Seller's executive officers or the knowledge that could have been obtained by any such officer after due inquiry and reasonable investigation.

"***Successful Bid***" has the meaning set forth in the Bid Procedures.

"***Successful Bidder***" has the meaning set forth in the Bid Procedures.

"***Supplemental Deposit***" has the meaning set forth in <u>Section 2.5(b)</u>.

"***Tangible Personal Property***" has the meaning set forth in <u>Section 2.1(c)</u>.

"***Tax***" or "***Taxes***" means any tax of any kind, including any federal, state, local or foreign income, capital gains, gift or estate, gross receipts, commercial activity, sales, use, value-added, production, ad valorem, transfer, documentary, franchise, net worth, capital, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, escheat or unclaimed property, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, intangibles, windfall profits, customs, duties, liability with respect to United States Treasury Forms FinCen 114 or TD F 90-22.1, or other tax, fee, assessment, or charge of any kind whatsoever, including tax for which a taxpayer is responsible by reason of Treasury Regulations Section 1.1502-6 (and any comparable provision of state, local or foreign Tax Law) or as a transferee, successor by reason of contract, Law, indemnity, common law doctrine of de facto merger, or otherwise, together with any interest, additions, fines or penalties with respect thereto and any interest in respect of such interest, additions, fines or penalties.

"***Tax Return***" means any return, declaration, report, claim for refund, information return or statement or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"*Third Party*" means any Person and/or group of Persons other than Seller, Buyer or any of their respective Affiliates.

## ARTICLE II
## PURCHASE AND SALE

2.1    **Purchase and Sale of Assets**.  Pursuant to sections 105, 363, and 365 of the Bankruptcy Code and subject to the terms and conditions set forth herein and the Sale Order, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, free and clear of all Encumbrances, all of Seller's right, title and interest in and to the Seller's assets set forth below (collectively, the "*Purchased Assets*"):

(a)    Inventory.  All inventory and packaging owned by Seller (collectively, the "*Inventory*"), including the inventory set forth on Schedule 2.1(a);

(b)    Contracts.  All of the rights of Seller under all Contracts set forth in the Contract & Cure Schedule to the extent such Contracts are assumed and assigned to Buyer pursuant to Section 6.13 (collectively, the "*Assigned Contracts*");

(c)    Tangible Personal Property.  All furniture, fixtures, equipment, machinery, rolling stock, if any (other than Excluded Assets), construction materials, furnishings, and other personal property owned by or held for use by Seller, including all trade fixtures, maintenance and repair supplies, spares (including grease, oils, chemicals and containers in which any of them are stored), desks, chairs, tables, tools, all computer equipment, telephones, other office equipment, replacement parts, and all other tangible personal property (collectively, the "*Tangible Personal Property*"), including the Tangible Personal Property set forth on Schedule 2.1(c);

(d)    Real Property.  The real property set forth on Schedule 2.1(d) (collectively, the "*Real Property*");

(e)    Governmental Authorizations.  All Governmental Authorizations to the extent assignable or otherwise transferable, if any;

(f)    Books and Records.  To the extent in the possession and control of the Seller or reasonably obtainable by Seller, all available books, records, files and papers, including all advertising materials, client and customer lists, supplier and vendor lists, purchase orders, sales and purchase invoices, production and operations reports, technical manuals, information and records, personnel and employment records and files, financial and accounting records, Tax Returns and tax records related to the Purchased Assets, other than the items described in Section 2.2(c) and Section 2.2(o) hereof (collectively, the "*Books and Records*");

(g)    Correspondence.  All written paper correspondence with or to any Governmental Authority in Seller's physical possession or reasonably obtainable by Seller, including letters, minutes and official contact reports relating to any aspect of Seller or the Seller's intended business prior to the Petition Date (collectively, "*Correspondence*");

(h)    Goodwill.  All the goodwill of the Seller and/or its intended business prior to the Closing Date including, without limitation, the right to own and use all trade names used by

8

the Seller; in furtherance of the foregoing, within five (5) Business Days following the Closing, Seller shall promptly change its name such that it no longer includes the names "Hamon", "Hamon Research-Cottrell" or any other name that, in Buyer's reasonable judgment, is confusingly similar thereto;

(i)    Insurance Proceeds. All proceeds received or receivable in respect of the Purchased Assets under the Existing Insurance Policies with respect to any damage, loss, act, matter or thing occurring after the date hereof to the Closing Date ("*Insurance Proceeds*"), including, for greater certainty, any amounts paid after Closing and irrespective of whether a claim has been filed or, if filed, accepted by the provider thereof prior to Closing;

(j)    Intellectual Property. All Company Used Intellectual Property, including the Intellectual Property listed in Schedule 4.8 and royalties, fees, income, payments, and other proceeds with respect to such Company Used Intellectual Property that accrued from and after the Closing Date and any security, Claim, remedy or other right, in each case, of Seller related to any of the foregoing; and

(k)    Deposit Accounts. All deposit accounts with any bank or other financial institution and the respective account numbers for the purposes of maintaining these accounts; provided that the foregoing shall not include any items excluded under Sections 2.2(a), which shall be transferred by Seller to a newly-created account established by Seller for purposes of Closing.

2.2    **Excluded Assets**. Notwithstanding the foregoing, the Purchased Assets shall not include the following assets of Seller (collectively, the "*Excluded Assets*"):

(a)    cash and cash equivalents, except for any Insurance Proceeds received as contemplated by Section 2.1(i);

(b)    all Contracts other than Assigned Contracts, if any (the "*Excluded Contracts*");

(c)    the corporate seals, organizational documents, minute books, stock books, Tax Returns of Seller or any Seller Affiliate (but not with respect to the Purchased Assets), books of account or other records having to do with the corporate organization or tax matters of Seller;

(d)    all benefit plans and assets attributable thereto;

(e)    all promissory notes and loans of any kind or nature;

(f)    deposits held by Seller in connection with any Excluded Contracts, and any deposits made by Seller in connection with the Bankruptcy Case;

(g)    royalties, fees, income, payments, and other proceeds with respect to Intellectual Property that accrued prior to the Closing Date and any security, Claim, remedy or other right related to any of the foregoing;

(h)    the rights which accrue or will accrue to Seller under this Agreement and the Ancillary Documents;

9

(i)      [Intentionally Omitted.]

(j)      all (i) Claims, rights, credits, cross claims, causes of action, and Actions of Seller, including without limitation any and all claims and actions under Chapter 5 of the Bankruptcy Code and any prepetition Claims against directors and officers of Seller, (ii) all defenses and rights of set-off and (iii) any other rights of Seller in respect of the foregoing clauses (i) and (ii), in each case to the extent not specifically and expressly included as Purchased Assets;

(k)      all insurance, utility, and tax deposits or tax refunds owing to Seller that are not Purchased Assets;

(l)      all insurance policies and insurance agreements, including any directors and officers' insurance policies; and

(m)      books and records (i) solely to the extent containing corporate governance or tax matters (except with respect to the Purchased Assets) of the Seller prior to the Closing Date, or (ii) that constitute Privileged Communications.

2.3      **Assumed Liabilities**.  Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge only the following Liabilities of Seller (collectively, the "*Assumed Liabilities*"), and no other Liabilities:

(a)      all Liabilities in respect of the Assigned Contracts to the extent that such Liabilities thereunder arise from and after the Closing Date, but excluding any Liabilities that arise from breach by Seller thereof prior to the Closing Date.  For the avoidance of doubt, Assumed Liabilities includes (i) Cure Claims for Assigned Contracts added to the Contract & Cure Schedule after July 27, 2022, and (ii) Cure Claims for the Assigned Contracts set forth on the Contract & Cure Schedule as of July 27, 2022, which are subject to the Cure Claims Cap;

(b)      all Liabilities arising from the conduct of the business or the use or operation of the Purchased Assets by Buyer from and after the Closing Date; and

(c)      Taxes, if any, that are the obligation of Buyer pursuant solely to Sections 6.8 or 6.9 hereof.

2.4      **Excluded Liabilities**.  Notwithstanding the provisions of Section 2.3 or any other provision in this Agreement to the contrary, Buyer shall not assume and shall not be responsible to pay, perform or discharge any Liabilities of Seller or related to Sellers' business prior to the Closing Date or the Purchased Assets of any kind or nature whatsoever other than the Assumed Liabilities (collectively, the "*Excluded Liabilities*").  Without limiting the generality of the foregoing, the Excluded Liabilities shall include, but not be limited to, the following:

(a)      all Liabilities arising out of or incurred or that will arise or be incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the Ancillary Documents and the transactions contemplated hereby and thereby, including fees and expenses of counsel, accountants, consultants, advisers and others;

10

(b)      all Liabilities for Taxes (i) of Seller, any Affiliate of Seller or of any other Person (whether direct or as a result of successor liability, transferee liability, joint and several liability or contractual liability, by Law, or otherwise), except as expressly provided in this Agreement; and (ii) with respect to the Purchased Assets or the Assumed Liabilities for the Pre-Closing Tax Period;

(c)      all Liabilities relating to or arising out of the Excluded Assets;

(d)      all Liabilities in respect of any pending or threatened Action arising out of, relating to or otherwise in respect of (i) the Seller prior to the Closing Date, (ii) the Purchased Assets to the extent such Action relates to the Seller's operations prior to the Closing Date or (iii) the Purchased Assets for any period on or prior to the Closing Date;

(e)      all recall, design defect or similar Claims arising from any products manufactured or sold or any service performed by Seller prior to the Closing Date;

(f)      all product Liability or similar claim (including any asbestos or asbestos-related claim) relating to a Person or property which arises out of or is based upon any express or implied representation, warranty, agreement or guaranty made by Seller, or by reason of the improper performance or malfunctioning of a product, improper design or manufacture, failure to adequately package, label or warn of hazards or other related product defects of any products at any time manufactured or sold or any service performed by Seller prior to the Closing Date;

(g)      all trade accounts payable;

(h)      all Liabilities of Seller or its Affiliates relating to or arising from unfulfilled commitments, quotations, purchase orders, customer orders or work orders that do not constitute part of the Purchased Assets or Assumed Liabilities;

(i)      all Liabilities (i) relating to or arising out of any employment Action or practice in connection with the employment or termination of employment of any Person currently or formerly employed or seeking to be employed by Seller or (ii) to indemnify, reimburse or advance amounts to any present, former or prospective officer, director, employee or agent of Seller (including with respect to any breach of fiduciary obligations by same);

(j)      all Liabilities under the Excluded Contracts;

(k)      all Liabilities associated with debt, loans or credit facilities or similar obligations of Seller and/or its Affiliates with respect to the Purchased Assets;

(l)      all Liabilities arising out of, in respect of or in connection with the actual or asserted failure by Seller to comply with any Law or Order or any other Liability with respect to an environmental condition or violation of any environmental law; and

(m)      all Liabilities arising from the conduct of the business or the use or operation of the Purchased Assets by Seller prior to the Closing Date whether known or unknown, asserted or unasserted; and

11

(n)     all Liabilities with respect to cure amounts with respect to any Contract, except for (i) Cure Claims for Assigned Contracts added to the Contract & Cure Schedule after July 27, 2022, and (ii) Cure Claims for the Assigned Contracts set forth on the Contract & Cure Schedule as of July 27, 2022, which are subject to the Cure Claims Cap.

2.5     **Purchase Price and Deposit**.

(a)     In addition to the assumption of the Assumed Liabilities by Buyer in accordance with the terms hereof, as full consideration for the Purchased Assets, Buyer shall pay an amount equal to:  (i) $2,915,500.00 in cash, <u>minus</u> (ii) if applicable, the amount by which the Buyer makes out-of-pocket payments of Cure Claims to counterparties to Assigned Contracts set forth on the Contract & Cure Schedule as of July 27, 2022, that are in excess of the Cure Claims Cap (the "***Purchase Price***").  At the Closing, Buyer shall pay Seller the Purchase Price, in cash, *minus* the Deposit as provided below.

(b)     Contemporaneously with Buyer's delivery of this Agreement to Seller, Buyer will deposit into an account (the "***Escrow***") maintained by an escrow holder identified and established by Seller and reasonably acceptable to Buyer (the "***Escrow Holder***"), in immediately available funds, an amount equal to $175,000 (the "***Initial Deposit***").  If Buyer is declared the Successful Bidder at the Auction, Buyer shall, if necessary, within three (3) Business Days of the close of the Auction, supplement the Initial Deposit to the Escrow by an amount equal to $116,550 (the "***Supplemental Deposit***") such that Buyer's deposit shall be equal to $291,550 (the "***Deposit***").  Upon receipt of any amount of the Deposit, the Escrow Holder shall immediately place and maintain such amount of the Deposit into a non-interest-bearing escrow account and such funds shall be disbursed in accordance with the terms of this Agreement and the Bidding Procedures Order.

(c)     If Buyer is the successful bidder, at the Closing, Buyer and Seller shall direct the Escrow Holder to deliver (and the Escrow Holder shall deliver) the Deposit without set-off or deduction to Seller and such Deposit shall automatically be deemed to be credited toward payment of the Purchase Price in accordance with <u>Section 2.5(a)</u>.

(d)     In the event Seller and Buyer terminate this Agreement under <u>Section 8.1(a)</u> or <u>Section 8.1(d)</u> of this Agreement, Buyer shall direct the Escrow Holder to disburse (and the Escrow Holder shall disburse) the Deposit to Buyer without set-off or deduction within five (5) Business Days to be retained by Buyer for Buyer's own account.

(e)     In the event Buyer terminates this Agreement under <u>Section 8.1(b)</u> of this Agreement, Buyer shall direct the Escrow Holder to disburse (and the Escrow Holder shall disburse) the Deposit to Buyer without set-off or deduction within five (5) Business Days to be retained by Buyer for Buyer's own account.

(f)     In the event Seller terminates this Agreement under <u>Section 8.1(c)(i)</u> or <u>Section 8.1(c)(ii)(y)</u> of this Agreement, Seller shall direct the Escrow Holder to disburse the Deposit to Seller within five (5) Business Days to be retained by Seller for Seller's own account.

DM3\8893399.1

(g)     In the event Seller terminates this Agreement under <u>Section 8.1(c)(ii)(x)</u> of this Agreement, Seller shall direct the Escrow Holder to immediately disburse the Deposit to Buyer without any set-off or deduction to be retained by Buyer for Buyer's own account.

(h)     If this Agreement shall be automatically terminated under <u>Section 8.1(e)</u> of this Agreement, Seller and Buyer shall direct the Escrow Holder to disburse the Deposit to Buyer without set-off or reduction within five (5) Business Days to be retained by Buyer for Buyer's own account.

2.6     **Allocation of Purchase Price**.  Seller and Buyer agree that the Purchase Price and the Assumed Liabilities as well as any other items constituting the amount realized for Tax purposes (the "***Allocable Consideration***") will be allocated among the Purchased Assets in a manner consistent with Section 1060 of the Code and any Treasury Regulations promulgated thereunder. Buyer will, no later than sixty (60) days following the Closing Date, prepare and deliver to Seller a schedule setting forth the allocation of the Allocable Consideration in accordance with the preceding sentence (the "***Allocation Schedule***").  Buyer and Seller will endeavor for a period of not less than thirty (30) days to resolve any disputes related to the Allocation Schedule.  Neither Buyer nor Seller will take any position that is contrary to or inconsistent with the Allocation Schedule for any Tax purpose, including with respect to any Tax Return (including amended Tax Returns). In the event that the Allocation Schedule is disputed by any Governmental Authority, the party receiving notice of such dispute will promptly notify the other party and the parties will consult in good faith as to how to resolve such dispute in a manner consistent with the agreed upon Allocation Schedule. Notwithstanding any provision of this <u>Section 2.6</u> to the contrary, if Buyer and Seller are not able to agree to the Allocation Schedule, each party shall be allowed to use that party's own formulation with respect to the allocation of the Purchase Price and the Assumed Liabilities.

2.7     **Third Party Consents**.  Notwithstanding the Sale Order or any provision of the Bankruptcy Code, to the extent that Seller's rights under any Contract constituting a Purchased Asset, may not be assigned to Buyer without the consent of another Person which has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, <u>provided</u>, <u>however</u>, that, subject to the satisfaction or waiver of the conditions contained in Article VII, the Closing shall occur and not be delayed notwithstanding the foregoing without any adjustment to the Purchase Price on account thereof, and Seller and Buyer, each at its own expense, shall use commercially reasonable efforts, and shall cooperate with each other, to obtain any such required consent(s) as promptly as possible.

2.8     **Cure Claims**. Buyer shall assume and pay on the Assignment Effective Date (a) for each Assigned Contract added to the Contract & Cure Schedule after July 27, 2022, all Cure Claims, and (b) with respect to Assigned Contracts set forth on the Contract & Cure Schedule as of July 27, 2022, all Cure Claims to the extent not in excess of an aggregate cap of $100,000 (the "***Cure Claims Cap***"). For the avoidance of doubt, notwithstanding anything to the contrary in this Agreement, the Cure Claims Cap shall not apply or in any way limit the Buyer's obligation to pay Cure Claims with respect to any Assigned Contract added to the Contract & Cure Schedule after July 27, 2022. The parties agree that the Cure Claims Cap is intended to and shall be applicable only to the five Assigned Contracts set forth on the Contract & Cure Schedule as of July 27, 2022.

DM3\8893399.1

Within five (5) Business Days after the Closing Date, Buyer shall provide to Seller a written certification that all Cure Claims required to be paid on the Closing Date have been satisfied and paid in full by Buyer. Upon the reasonable request of Seller, Buyer shall provide to Seller documentation reasonably evidencing the full payment and satisfaction of any Cure Claim.

## ARTICLE III

## CLOSING

3.1     **Closing**. Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "*Closing*") shall take place remotely via the exchange of documents and signatures, or in such other manner as will be mutually acceptable between Buyer and Seller, (i) on or before August 17, 2022, or (ii) at the option of the Seller, on or before the Outside Date. The date on and time at which the Closing actually occurs is herein referred to as the "*Closing Date*". The effective time of the Closing will be 11:59 pm local New York, New York time on the Closing Date.

3.2     **Closing Deliverables**.

(a)     At the Closing, Seller shall deliver to Buyer, or at Buyer's option, make available for retrieval at the Premises by Buyer, the following:

(i)     The Purchased Assets;

(ii)     a bill of sale substantially in the form of Exhibit A hereto with such revisions as agreed to by Buyer and Seller (the "*Bill of Sale*") and duly executed by Seller;

(iii)     an assignment and assumption agreement substantially in the form of Exhibit B hereto with such revisions as agreed to by Buyer and Seller (the "*Assignment and Assumption Agreement*") and duly executed by Seller;

(iv)     the Seller Closing Certificate;

(v)     a copy of the Sale Order entered by the Bankruptcy Court;

(vi)     a certificate from Seller certifying that, pursuant to Treasury Regulation Section 1.445-2(b), Seller is not a foreign person within the meaning of Section 1445 of the Code and in a form reasonably acceptable to Buyer, as provided in Treasury Regulation Section 1.445-2(b)(2)(iv); and

(vii)     such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement.

(b)     At the Closing, Buyer shall deliver to Seller the following:

(i)     the Purchase Price, *minus* the Deposit, in accordance with wire instructions provided by the Seller to the Buyer;

14

(ii)     the Assignment and Assumption Agreement, duly executed by
Buyer;

(iii)     the Buyer Closing Certificate.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

As a material inducement to Buyer to enter into this Agreement and to consummate the transactions contemplated herein, Seller represents and warrants to Buyer that the statements contained in this Article IV are true and correct as of the date hereof and shall be true and correct as of the Closing Date, it being acknowledged and agreed that the representations and warranties set forth in this Article IV shall not survive the Closing.

4.1     **Organization and Qualification of Seller**.  Seller is a corporation duly organized, validly existing and in good standing under the Laws of the state of Delaware. Seller commenced the Bankruptcy Case, which is currently pending in the Bankruptcy Court.

4.2     **Authority of Seller**.  Subject only to entry of the Sale Order in the Bankruptcy Case, Seller has full corporate power and authority to enter into this Agreement and the Ancillary Documents to which it is or will be a party and to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery by Seller of this Agreement and any Ancillary Document to which Seller is or will be a party, the performance by Seller of its respective obligations hereunder and thereunder and the consummation by Seller of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Seller.  This Agreement has been duly executed and delivered by Seller, and (assuming due authorization, execution and delivery by Buyer) this Agreement constitutes a legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms.  When each Ancillary Document to which Seller is or will be a party has been duly executed and delivered by Seller (assuming due authorization, execution and delivery by each other party thereto), such Ancillary Document will constitute a legal and binding obligation of Seller enforceable against it in accordance with its terms.

4.3     **No Conflicts; Consents; Assigned Contracts**.  Subject to entry of the Sale Order, neither the execution, delivery nor performance of this Agreement by Seller, nor the consummation by Seller of the transactions contemplated by this Agreement, will: (a) conflict with or violate Seller's organizational documents; or (b) violate any Law applicable to Seller or the Purchased Assets.

4.4     **Title to Purchased Assets**.  No Person other than Seller has title to the Purchased Assets (other than any Purchased Assets that are subject to Assigned Contracts).  Subject to entry of the Sale Order, at Closing, Buyer will be vested with good and marketable title to, or in the case of leaseholds, valid leasehold interests in, all of the Purchased Assets, which Purchased Assets shall be conveyed free and clear of all Encumbrances.

4.5     **Insurance.**  To Seller's Knowledge, Schedule 4.5 sets forth a true and complete list of all insurance policies (the "***Existing Insurance Policies***") maintained by Seller with respect to the Purchased Assets, together with the insurer, the amount of the coverage, the type of insurance,

15

the policy number and any pending Claims thereunder. Seller is up-to-date in the payment of all premiums and other amounts payable under the Existing Insurance Policies that it carries to maintain the Existing Insurance Policies in full force and effect, and Seller shall continue to make such payments until Closing. To Seller's Knowledge, as of the date hereof, all such policies are in full force and effect in all material respects and are sufficient for compliance by Seller with all applicable Laws.

4.6     **Legal Proceedings**.  Other than as disclosed (a) to Buyer in writing or (b) in the filings under the Bankruptcy Case, there are no Actions pending against Seller or by Seller, to Seller's Knowledge, threatened against Seller that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement and, to Seller's Knowledge, no event has occurred or circumstances exist that are reasonably likely to give rise or serve as a basis for any such Action.

4.7     **[Intentionally Omitted]**.

4.8     **No Other Representations and Warranties**.  Except for the representations and warranties contained in this <u>Article IV</u> or in any Ancillary Document to which Seller is or will be a party, neither Seller nor any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller, including any representation or warranty as to (a) the accuracy or completeness of any information regarding the Seller's business prior to the Petition Date or the Purchased Assets furnished or made available to Buyer and its Representatives, including any management presentations, (b) future revenue, profitability, prospects or likelihood of success, or (c) any other matter, including any representation or warranty arising from statute or otherwise in law.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF BUYER

As a material inducement to Seller to enter into this Agreement and to consummate the transactions contemplated herein, subject to the entry of the Sale Order, Buyer represents and warrants to Seller that the statements contained in this <u>Article V</u> are true and correct as of the date hereof and shall be true and correct as of the Closing Date, it being acknowledged and agreed that the representations and warranties set forth in this <u>Article V</u> shall not survive the Closing.

5.1     **Organization of Buyer**.  Buyer is a corporation duly organized, validly existing and in good standing under the Laws of the state of Delaware.

5.2     **Authority of Buyer**.  Buyer has full corporate power and authority to enter into this Agreement and the Ancillary Documents to which Buyer is or will be a party and to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and any Ancillary Document to which Buyer is or will be a party, the performance by Buyer of its respective obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization,

execution and delivery by Seller) this Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally.  When each Ancillary Document to which Buyer is or will be a party has been duly executed and delivered by Buyer (assuming due authorization, execution and delivery by each other party thereto), such Ancillary Document will constitute a legal and binding obligation of Buyer enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally.

5.3    **No Conflicts; Consents**.  The execution, delivery, and performance by Buyer of this Agreement and the Ancillary Documents to which Buyer is or will be a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) violate or conflict with any provision of the certificate of incorporation, bylaws, or other organizational or governing documents of Buyer, as applicable; (b) violate or conflict with any provision of any Law or Order applicable to Buyer; or (c) require the consent, notice, declaration, or filing with or other action by any Person or require any permit, license, or Order.

5.4    **Brokers**.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any Ancillary Document based upon arrangements made by or on behalf of Buyer.

5.5    **Sufficiency of Funds**.  Buyer has sufficient cash on hand to enable it to make payment of the Purchase Price and consummate the transactions contemplated by and in the timeframe set forth in this Agreement.

5.6    **Legal Proceedings**.  There are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement; and no event has occurred or circumstances exist that may give rise or serve as a basis for any such Action.

5.7    **"As Is" Transaction**. BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE IV ABOVE OR IN ANY ANCILLARY DOCUMENT TO WHICH SELLER IS OR WILL BE A PARTY, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS INCLUDING EXPENSES TO BE INCURRED IN CONNECTION WITH THE PURCHASED ASSETS, THE PHYSICAL CONDITION OF ANY REAL OR PERSONAL PROPERTY COMPRISING A PART OF THE PURCHASED ASSETS OR WHICH IS THE SUBJECT OF ANY OTHER LEASE OR OTHER CONTRACT TO BE ASSUMED BY BUYER AT THE CLOSING, THE ENVIRONMENTAL CONDITION OR OTHER MATTER RELATING TO THE PHYSICAL CONDITION OF ANY REAL PROPERTY OR IMPROVEMENTS, THE ZONING OF ANY SUCH REAL PROPERTY OR IMPROVEMENTS, THE VALUE OF THE PURCHASED ASSETS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF PROPERTY CONSTITUTING THE PURCHASED ASSETS, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER

17

PORTION OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE PURCHASED ASSETS OR ANY PORTION THEREOF. WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS. BUYER FURTHER ACKNOWLEDGES THAT BUYER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF SUCH OTHER MATTERS RELATING TO OR AFFECTING THE PURCHASED ASSETS AS BUYER DEEMED NECESSARY OR APPROPRIATE AND BUYER IN PROCEEDING WITH ITS ACQUISITION OF THE PURCHASED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE IV OR IN ANY ANCILLARY DOCUMENT TO WHICH SELLER IS OR WILL BE A PARTY, IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, BUYER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

## ARTICLE VI

## COVENANTS

6.1    **Operation of the Business.** From the date of this Agreement until the Closing Date, except: (i) as required by Law, including in connection with the Bankruptcy Case; (ii) as expressly set forth in this Agreement; or (iii) as otherwise consented to by Buyer in writing, Seller shall not, with respect to the Purchased Assets:

(i)    terminate or reject any Contract on the Contract & Cure Schedule;

(ii)    waive or release any material term, right or Claim of or for the benefit of Seller, relating to the Assigned Contracts, if any, or, without first obtaining Buyer's express written consent, such consent not to be unreasonably withheld or delayed, any of the Purchased Assets;

(iii)    take any other action that would materially and adversely affect the value of the Purchased Assets; or

(iv)    agree to take any of the foregoing actions.

6.2    **Notice of Certain Events**.

(a)    From the date hereof until the Closing, Seller shall promptly notify Buyer in writing of:

(i)    any written or, to Seller's Knowledge, oral, notice or other communication from a Governmental Authority that has or is reasonably likely to have a material and adverse effect on the Purchased Assets or the ability of the Seller to consummate the transactions contemplated by this Agreement;

18

(ii)     any Actions commenced or, to Seller's Knowledge, threatened, that has or is reasonably likely to have a material and adverse effect on the Purchased Assets or the ability of the Seller to consummate the transactions contemplated by this Agreement; and

(iii)     the occurrence, or failure to occur, of any event, which occurrence or failure would be likely to cause any of the representations or warranties of Seller contained in this Agreement or in any Ancillary Document to be untrue or inaccurate in any material respect (or, if already qualified by materiality, in all respects).

(b)     Buyer's receipt of information pursuant to this <u>Section 6.2</u> shall not give Buyer an independent right to terminate this Agreement except to the extent it would give rise to a right of termination under <u>Article VII</u>.

6.3     **Confidentiality**.  Each of Buyer and Seller acknowledges and agrees that the Confidentiality Agreement remains in full force and effect and, in addition, covenants and agrees to keep confidential, in accordance with the provisions of the Confidentiality Agreement (other than as may be permitted or required under this Agreement), information provided to, or reviewed or accessed by, Buyer or Seller or their respective Representatives pursuant to this Agreement.  If this Agreement is, for any reason, terminated prior to the Closing, the Confidentiality Agreement and the provisions of this <u>Section 6.3</u> shall nonetheless continue in full force and effect.

(a)     Notwithstanding anything to the contrary in this Agreement or the Confidentiality Agreement, the Confidentiality Agreement shall terminate on the Closing Date.

(b)     Each of the parties hereto agrees that after the Closing Date Seller and Buyer (and its Affiliates) and their successors and assigns will have the following rights regarding Privileged Communications.  Seller shall continue to hold and control the privilege with respect to all Privileged Communications that existed prior to the Closing Date.  Seller shall have no obligation to include in the Books and Records any records of any Privileged Communications.  It may be impracticable to remove from the Books and Records all records of any Privileged Communications.  No attorney-client privilege, attorney work product or other applicable evidentiary privilege or protection shall be waived or is intended to be waived with respect to any such Privileged Communications.  Buyer and Seller shall protect all Privileged Communications (to the extent marked "privileged", on law firm letterhead or otherwise reasonably ascertainable as attorney-client privileged by a non-attorney) from disclosure or release.  In the event that a dispute arises between Buyer, on the one hand, and a Third Party, on the other hand, Buyer or any of its Affiliates may assert the attorney-client privilege to prevent the disclosure of any Privileged Communications to such Third Party; provided, however, that neither Buyer nor any of its Affiliates may waive such privilege without the prior written consent of Seller, such consent not to be unreasonably withheld or delayed, or unless ordered by a court of competent jurisdiction.  Likewise, in the event that a dispute arises between Seller, on the one hand, and a Third Party, on the other hand, Seller may assert the attorney-client privilege to prevent the disclosure of any privileged communications to such Third Party.

6.4     **Books and Records**.  In order to facilitate the resolution of any claims made against or incurred by Seller, the continuing administration of the Bankruptcy Case (including the pursuit of any avoidance, preference or similar actions), or for any other reasonable purpose, for a period

of two (2) years after the Closing Date (subject to extension if agreed to in writing by Buyer and Seller), Buyer shall: retain the Books and Records (and, to the extent acquired hereunder, the computer servers upon which any such Books and Records are maintained) and any Correspondence relating to periods prior to the Closing in a manner reasonably consistent with the manner in which Buyer maintains its own records; and upon reasonable notice and at Seller's own cost and expense, afford Seller's Representatives reasonable access (including the right to make, at Seller's expense, photocopies), during normal business hours, to such Books and Records and Correspondence.

6.5    **Closing Conditions**. From the date hereof until the Closing, each party hereto shall use commercially reasonable efforts to take such actions as are necessary to expeditiously satisfy the closing conditions set forth in Article VII hereof.

6.6    **Applicable Laws**. From the date hereof until Closing, Seller shall comply with all applicable Laws as same pertain to Purchased Assets in all material respects.

6.7    **Insurance**. From the date hereof until the Closing Date, Seller shall cause the Existing Insurance Policies that it carries not to be cancelled or terminated or any other coverage thereunder to lapse, unless simultaneously with such terminations, cancellation or lapse, replacement policies underwritten by insurance companies providing the current coverage or insurance companies of nationally recognized standing providing coverage equal to or greater than the coverage under the cancelled, terminated or lapsed policies, and where possible, for substantially similar premiums, are in full force and effect.

6.8    **Transfer Taxes**. Any sales, purchases, transfer, stamp, documentary stamp, use, or similar taxes that may be payable by reason of the sale of the Purchased Assets under this Agreement or the transactions contemplated herein shall be borne and timely paid by Buyer.

6.9    **Prorations**. Rent, Taxes (other than Taxes imposed or assessed on income and Taxes payable by Buyer pursuant to Section 6.8), utilities, and prepaid expenses related to the Purchased Assets shall be prorated between Seller and Buyer as of the Closing Date; provided, however, that for the avoidance of doubt, all property Taxes shall be pro-rated based on the period to which the tax applies without regard to the date of lien or assessment. All rent, Taxes (other than Taxes imposed or assessed on income), utilities, and prepaid expenses related to the Purchased Assets due in respect of periods prior to and including the Closing Date (other than Cure Claims), shall be the obligations of Seller, and all rent, Taxes (other than Taxes imposed or assessed on income and Taxes payable by Buyer pursuant to Section 6.8), utilities, and prepaid expenses related to the Purchased Assets due in respect of periods after the Closing Date shall be the obligations of and shall be paid in full or otherwise satisfied by Buyer; provided, further, however, that amounts that Buyer or Seller is obligated to pay under this Section 6.9 shall be treated as a credit or charge to Seller at Closing to the extent that the amount either (i) was already paid by Seller prior to the Closing or (ii) is a Tax for which the Sale Order provides for such obligation to attach to the Purchase Price, in which case such Tax obligation shall be retained by Seller.

6.10   **Further Assurances**. Following the Closing, each of the parties hereto shall, and Buyer shall cause its Affiliates to, execute and deliver such additional documents, instruments,

20

conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the Ancillary Documents.

6.11 **Assistance**. Buyer and Seller agree, upon request, to use reasonable efforts to obtain any certificate or other document from any Governmental Authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including, but not limited to, with respect to the transactions contemplated by this Agreement).

6.12 **Bankruptcy Court Matters**.

(a) This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids. Until the designation of a Successful Bidder in accordance with the Bid Procedures and Bidding Procedures Order, Seller is permitted to cause Seller's Representatives to initiate contact with, solicit, or encourage submission of any inquiries, proposals, or offers by, any Person (in addition to Buyer and Buyer's Affiliates and Representatives) in connection with any sale or other disposition of the Purchased Assets. In addition, Seller may, in accordance with the Bid Procedures and Bidding Procedures Order, respond to any inquiries or offers to purchase all or any part of the Purchased Assets or equity interests in Seller and perform any and all other acts related thereto that are required under the Bankruptcy Code, the Bidding Procedures Order, or other applicable Law, including supplying information relating to the Seller's business prior to the Petition Date and the assets of Seller to prospective purchasers.

(b) If Buyer is designated as the Successful Bidder, Seller shall seek and obtain an order of the Bankruptcy Court (the "*Sale Order*") that, among other things, (i) approves the sale of the Purchased Assets to Buyer, and authorizes Seller to proceed with the sale of the Purchased Assets to Buyer on the terms and conditions set forth in this Agreement, (ii) includes a finding there was due and proper disclosure of the B. Riley Interests and that Buyer and any designee of Buyer under Section 9.7 of this Agreement is a good faith purchaser of the Purchased Assets within the meaning of section 363(m) of the Bankruptcy Code and is entitled to the protections of section 363(m) of the Bankruptcy Code, (iii) states that the sale of the Purchased Assets to Buyer shall be free and clear of all Encumbrances, (iv) approves Seller's assumption and assignment to Buyer of the Assigned Contracts, if any, pursuant to section 365 of the Bankruptcy Code subject to Buyer's payment of applicable Cure Claims and ability to demonstrate to the Bankruptcy Court adequate assurance of future performance under the Assigned Contracts and includes findings of fact and conclusions of law reasonably satisfactory to the Buyer regarding the assumption of all Assumed Contracts, and (v) includes findings of fact and conclusions of law that Buyer is not a successor to Seller and shall have no liability as a successor to Seller; provided, that nothing in the Sale Order or this Agreement (x) releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the Closing Date or (y) authorizes the transfer or assignment of any governmental license, permit, registration, authorization, or approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. On or prior to the date hereof, Buyer provided Seller with such financial and other information supporting Buyer's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code,

including Buyer's financial wherewithal and willingness to perform under the Assigned Contracts, if any, in a form that allows Seller to serve such information on any counterparties to the Assigned Contracts, if any, in accordance with the Bidding Procedures Order. Both Buyer's and Seller's obligations to consummate the transactions contemplated in this Agreement are conditioned upon the Bankruptcy Court's entry of the Sale Order.

(c)     Seller and Buyer agree that, in the event that Buyer is not the Successful Bidder at the Auction, and an Alternative Transaction with the Successful Bidder does not close, if and only if Buyer is the Back-Up Bidder, Buyer shall promptly consummate the transactions set forth in this Agreement upon the terms and conditions as set forth herein, including payment of the Purchase Price (as the same may be modified by Buyer at the Auction). Buyer's obligation to remain as the Back-Up Bidder shall not terminate until the earlier to occur of (i) the closing of the Alternative Transaction with the Successful Bidder and (ii) the Outside Date. Buyer and Seller acknowledge that time is of the essence in achieving Closing and shall undertake all commercially reasonable efforts to reach Closing in a timely manner.

(d)     Seller and Buyer will use their respective good faith and commercially reasonable efforts to cause the Sale Order to become a Final Order as soon as practicable after its entry.

(e)     Seller shall

(i)     seek entry by the Bankruptcy Court of the Sale Order by 11:59 p.m. prevailing Eastern time on or before August 2, 2022, or such other date as agreed by the parties; and

(ii)     consummate the Closing as promptly as practicable after entry of the Sale Order, but in no event later than the Outside Date, unless otherwise agreed in writing by Buyer and Seller.

(f)     Seller will provide Buyer with a reasonable opportunity to review and approve the proposed form of Sale Order and a reasonable opportunity to review and comment upon all other motions, applications, petitions, schedules and supporting papers relating to the transactions contemplated by this Agreement prepared by Seller (including forms of Orders and notices to interested parties) prior to the filing thereof in the Bankruptcy Case. Seller shall use commercially reasonable efforts to obtain entry of the Sale Order.

(g)     Buyer will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by Buyer of its obligations under this Agreement and all other agreements, instruments, certificates and other documents to be entered into or delivered in connection with the transactions contemplated by this Agreement and demonstrating that Buyer is a good faith buyer under section 363(m) of the Bankruptcy Code.

(h)     If an appeal is taken, or petition for certiorari or motion for rehearing or re-argument filed, or a stay pending appeal is requested from the Bidding Procedures Order or the Sale Order, Seller will promptly notify Buyer in writing of such appeal, petition, motion or stay

22

request and Seller, with input from Buyer, will take all reasonable steps to defend against such appeal, petition, motion or stay request. Notwithstanding the foregoing, nothing in this Agreement precludes the parties from consummating the transactions contemplated by this Agreement if the Sale Order has been entered and has not been stayed and Buyer and Seller mutually waive in writing the condition to Closing that the Sale Order be a Final Order.

(i)    Seller and Buyer shall comply with all of their respective obligations under the Bidding Procedures Order and Sale Order (after the entry of such order by the Bankruptcy Court).

(j)    Seller shall comply with all applicable notice and other requirements of the Bankruptcy Code, Bankruptcy Rules and the terms of the Bidding Procedures Order in connection with the transactions contemplated herein.

6.13    **Assumption & Rejection of Executory Contracts**.

(a)    Schedule 6.13 (the "*Contract & Cure Schedule*") sets forth a list of all Contracts that Buyer has advised Seller it wants to assume and Seller to assign to Buyer under section 365 of the Bankruptcy Code and in accordance with Section 6.13(b) below, which schedule may be updated in accordance with the Bidding Procedures Order prior to Closing. The Cure Claims in respect of each Contract based upon the most recent financial information available to Seller are set forth in the Contract & Cure Schedule. From the date of this Agreement until the conclusion of the Auction, or if Buyer is designated as the Successful Bidder or Back-Up Bidder at the Auction, at any time prior to the Closing Date, Buyer, in its sole and absolute discretion, may amend the Contract & Cure Schedule to add any Contract as an Assigned Contract provided that Buyer pays any applicable Cure Claims with respect to any such newly added Assigned Contract on the Assignment Effective Date, notice to any counterparty to any additional Contract that will be an Assigned Contract shall be given by Seller in accordance with the notice and service provisions set forth in the Bidding Procedures and Bidding Procedures Order. Unless the Bankruptcy Court orders otherwise, each Contract included on the Contract & Cure Schedule will be deemed to have been assigned to Buyer and become an Assigned Contract on the date (the "*Assignment Effective Date*") that is the later of: (i) the Closing Date, or (ii) contemporaneously with the resolution of any objections to the assumption and assignment of such Contract or to a proposed Cure Claim.

(b)    Neither designation (or removal of any designation) of any Contract for assumption and assignment in accordance with this Section 6.13, the Bidding Procedures Order, the Bidding Procedures Order or the Sale Order, nor denial by the Bankruptcy Court of any Contract designated for assumption and assignment, will give rise to any right to any adjustment to the Purchase Price; provided, however, for the avoidance of doubt, Buyer shall be responsible and liable for payment of any and all (i) Cure Claims for Assigned Contracts added to the Contract & Cure Schedule after July 27, 2022, and (ii) Cure Claims for the Assigned Contracts set forth on the Contract & Cure Schedule as of July 27, 2022, subject to the Cure Claims Cap.

23

6.14    **Transfer of Governmental Authorizations**.

(a)    From and after the date hereof Seller, and Buyer shall reasonably cooperate (at Buyer's sole cost and expense) to transfer (to the extent transferable) to Buyer as of the Closing Date (or as soon as reasonably practicable thereafter) any Governmental Authorizations included in the Purchased Assets; provided, however, that any reasonable, documented out-of-pocket costs associated with such cooperation by Seller after the Closing Date (including the *pro rata* portion of the costs of any employee, consultant or independent contractor directly providing such cooperation after the Closing Date, as determined by the amount of time dedicated by such employee, consultant or independent contractor to such cooperation as a proportion of all time dedicated by such employee, consultant or independent contractor to Seller) shall be borne by Buyer.

6.15    **Excluded Contracts; Consents**.

(a)    At any time prior to the Closing Date, Buyer may, at its sole discretion and at its sole expense, request for Seller to maintain in effect any Excluded Contract or for up to three (3) months after the Closing (or as otherwise agreed in writing by Seller and Buyer) for the purposes of passing through the benefits of such Excluded Contract to Buyer, and (i) provided Buyer timely pays any costs associated with such Excluded Contract, including any costs referred to in clause (iii) below, Seller shall maintain in effect such Excluded Contract and not reject such Excluded Contract, (ii) Seller and Buyer shall use commercially reasonable efforts to agree on arrangements for the purposes of passing through the benefits of such Excluded Contract to Buyer, and (iii) any such arrangements described in the foregoing shall be at the sole expense of Buyer (including all statutory and other costs required to be paid or otherwise incurred in the Bankruptcy Case, counsels' and other professionals fees and expenses, to the extent such costs would not have been incurred but for this Section 6.14); provided, that in no event shall Seller be required to maintain any Excluded Contract beyond the effective date of a confirmed plan in the Bankruptcy Case.

6.16    **Employees**. Following the Closing only, Buyer shall have the right, but not the obligation, to extend an offer of at will employment to the former employees, consultants or independent contractors of Seller selected by Buyer. Notwithstanding the foregoing, Seller will make available the following Persons to Buyer such that Buyer may offer employment to such Persons prior to the Closing (provided that for clarity, any such Person's acceptance of employment is not a condition to the Closing pursuant to Article VII):  Richard J. Bednash, Hiranmayee Goel, Justin MacEachern and Jose Rodriguez.

## ARTICLE VII

## CONDITIONS TO CLOSING

7.1    **Conditions to Obligations of All Parties**.  The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or waiver by both Buyer and Seller in writing, at or prior to the Closing, of each of the following conditions:

24

(a)    The Bankruptcy Court shall have entered the Sale Order in form and substance reasonably acceptable to Seller and Buyer, and the Sale Order must be a Final Order.

(b)    No injunction, stay, or similar Order issued by any Governmental Authority shall be in effect that restrains, enjoins, stays, or prohibits the consummation of the transactions set forth in this Agreement and there must not be in effect any Law that would prohibit or make illegal the consummation of the transactions contemplated by this Agreement.

7.2    **Conditions to Obligations of Buyer**.  The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)    The representations and warranties of Seller contained in Article IV of this Agreement shall be true and correct in all material respects, at and as of the date hereof, and on the Closing Date (except for representations and warranties made as of a specified date, the accuracy of which shall be determined as of that specified date and except for representations and warranties that are qualified by materiality, which shall be true in all respects).

(b)    Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the Ancillary Documents to be performed or complied with by it prior to or on the Closing Date; provided, however, that with respect to agreements, covenants and conditions that are qualified by materiality, Seller shall have performed such agreements, covenants and conditions, as so qualified, in all respects.

(c)    Seller shall have delivered to Buyer duly executed counterparts to the Ancillary Documents and such other documents and deliveries set forth in Section 3.2(a).

(d)    Buyer shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Seller, in such person's capacity as an officer and not in such person's individual capacity, that each of the conditions set forth in Section 7.2(a)-7.2(c) have been satisfied (the "*Seller Closing Certificate*").

(e)    Seller shall have executed and delivered a trademark assignment in a form acceptable to Buyer evidencing the assignment of the Intellectual Property listed on Schedule 7.2(e), and Seller hereby irrevocably authorizes Buyer to file such trademark assignment immediately following the Closing.

(f)    Each of Chris Bowman, Joseph J. Demartino, John P. Huchko, Christian McNallan and Thomas Toth (collectively, the "*Key DAC Personnel*") shall have accepted offers of employment with Buyer or an entity designated by Buyer, on or before 2:00 p.m. EDT on August 3, 2022; provided, however, that Buyer shall have made good faith offers in writing to such Key DAC Personnel on or before August 1, 2022, with employment terms, including compensation and benefits, at least as favorable to such Key DAC Personnel as they receive in their present employment with Seller or one of its affiliates.  If Buyer does not make such good faith offers in writing to such Key DAC Personnel on or before August 1, 2022, then this paragraph (f) shall not be applicable as a condition to closing.

25

7.3    **Conditions to Obligations of Seller**.  The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a)    The representations and warranties of Buyer contained in Article V of this Agreement shall be true and correct in all respects at and as of the date hereof, as though made at and as of the date hereof (except for representations and warranties made as of a specified date, the accuracy of which shall be determined as of that specified date), with only such exceptions as do not have and would not reasonably be expected to have a material adverse effect on Buyer or the transactions contemplated by this Agreement.

(b)    Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the Ancillary Documents to be performed or complied with by it prior to or on the Closing Date; *provided, however,* that with respect to agreements, covenants and conditions that are qualified by materiality, Buyer shall have performed such agreements, covenants and conditions, as so qualified, in all respects.

(c)    Seller shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Buyer, in such person's capacity as an officer and not in such person's individual capacity, that each of the conditions set forth in Section 7.3(a)-(c) have been satisfied (the "***Buyer Closing Certificate***").

## ARTICLE VIII

### TERMINATION

8.1    **Termination**.  This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of Seller and Buyer;

(b)    by Buyer by written notice to Seller if:

(i)    Buyer is not then in material breach of any provision of this Agreement and there has been a material breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article VII and such breach, inaccuracy or failure is not able to be cured by Seller on or before the Outside Date;

(ii)    any of the conditions set forth in Section 7.1 or Section 7.2 shall not be fulfilled by the Outside Date, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; or

(iii)    (x) the Bankruptcy Case is dismissed or converted into a case under chapter 7 of the Bankruptcy Code or (y) an examiner with expanded powers that prevents the Closing from occurring or a trustee is appointed in the Bankruptcy Case.

(c)     by Seller by written notice to Buyer if:

(i)     Seller is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article VII and such breach, inaccuracy or failure has not been cured by Buyer within ten (10) Business Days of Buyer's receipt of written notice of such breach from Seller; or

(ii)     any of the conditions set forth in (x) Section 7.1 or (y) Section 7.3 shall not have been, or if it becomes reasonably apparent that any of such conditions will not be, fulfilled by the Outside Date, unless such failure shall be due to the failure of Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; or

(d)     by Buyer or Seller by written notice to the other party if:

(i)     there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited in any material respect, or (ii) any Governmental Authority shall have issued a Order restraining or enjoining the transactions contemplated by this Agreement, and such Order shall have become final and non-appealable or will cause the closing not to occur by the Outside Date;

(ii)     there is in effect a Final Order restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement; provided, however, that the right to terminate this Agreement under this Section 8.1(d)(ii) will not be available to any party whose failure to fulfill any covenant or obligation under this Agreement is the cause of or resulted in the action or event described in this Section 8.1(d)(ii) occurring; or

(iii)     the Closing has not occurred by the Outside Date; provided, however, that the right to terminate this Agreement under this Section 8.1(d)(iii) will not be available to any party whose failure to fulfill any covenant or obligation under this Agreement is the cause of or resulted in the action or event described in this Section 8.1(d)(iii) occurring;

(e)     This Agreement shall terminate automatically in the event that an Alternative Transaction has been closed and consummated following approval by the Bankruptcy Court.

8.2     **Effect of Termination**.  In the event of the termination of this Agreement in accordance with this Article VIII of this Agreement shall forthwith become void and there shall be no Liability on the part of any party hereto except:

(a)     as set forth in Section 2.5(d)-(h) hereof; and

(b)     that nothing herein shall relieve any party hereto from Liability to the other party for any breach of any provision hereof.

27

## ARTICLE IX

## MISCELLANEOUS

9.1  **Expenses**.  Except as otherwise expressly provided herein, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.

9.2  **Notices**.  All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt) with a copy by email; (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested) with a copy by email; (c) on the date sent by email of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid with a copy by email. Notwithstanding anything to the contrary herein, any and all notices, requests, consents, claims, demands, waivers and other communications hereunder not otherwise transmitted by email shall additionally transmit such communications by email to any and all respective parties on the date such notice, request, consent, claim, demand, waiver, or other communication was otherwise transmitted (with confirmation of transmission).  Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 9.2.

If to Seller:     c/o Hamon Corporation
                  46 Main Street, No. 300
                  Somerville, NJ 08876
Email:  jay.demartino@hamon.com

with a copy (that shall not constitute notice) to:

                  Duane Morris LLP
                  1201 N. Market Street, Suite 501
                  Wilmington, Delaware 19801
                  Attention: Christopher Winter, Esq., and Jarret Hitchings, Esq.
                  Email:     cmwinter@duanemorris.com;
                  jhitchings@duanemorris.com

with a copy (which shall not constitute notice) to counsel to the Creditors Committee:

                  Troutman Pepper LLP
                  1313 N Market Suite 5100
                  Wilmington, Delaware 19801 Attn: Fran Lawall, Esq. and
                  Attention: Francis J. Lawall, Esq., Deborah Kovsky-Apap, Esq.

28

Email:    francis.lawall@troutman;
deborah.kovsky@troutman.com

If to Buyer:       The Babcock & Wilcox Company
1200 E. Market Street, Suite 650
Akron, Ohio 44305
Attention: Lou Salamone
Email: lsalamone@babcock.com (with copy to
glgolub@babcock.com)

with a copy (that shall not constitute notice) to:

Thompson Hine LLP
3900 Key Center, 127 Public Square
Cleveland, OH 44114
Attention:  Will Henry and Jeremy Campana
Email: Will.Henry@ThompsonHine.com;
Jeremy.Campana@ThompsonHine.com

9.3     **Interpretation**.  For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Schedules and Exhibits mean the Articles and Sections of, Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.  The Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

9.4     **Headings**.  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

9.5     **Severability**.  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

9.6    **Entire Agreement**. This Agreement, including the Exhibits, the Schedules and the Ancillary Documents, the Bidding Procedures Order (once entered) and the Sale Order (once entered), if Buyer is the Successful Bidder, constitute the entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the Ancillary Documents, the Exhibits, and the Schedules, the statements in the body of this Agreement will control, except as otherwise provided in the Sale Order.

9.7    **Assignment, Successors and No Third-Party Rights**. This Agreement binds and benefits the parties and their respective successors (including any trustee, receiver, receiver-manager, interim receiver or monitor or similar officer appointed in any respect of Seller under chapter 11 or chapter 7 of the Bankruptcy Code and any entity appointed as a successor to Seller pursuant to a confirmed chapter 11 plan). No party may delegate any performance of its obligations under this Agreement, except that Buyer may at any time delegate its rights and the performance of its obligations to any Affiliate of Buyer so long as Buyer remains fully responsible for the performance of the delegated obligation. Buyer may designate one or more Affiliates, including any special purpose entities that may be organized by Buyer for the purpose of purchasing the Purchased Assets and assuming the Assumed Liabilities, or any portion thereof at closing, and upon written notice to Seller of any such designation by Buyer, Seller agrees that such designee of Buyer shall be deemed to be Buyer hereunder for all purposes and Seller further agrees to execute and deliver all instruments of transfer with respect to the Purchased Assets directly to, and in the name of, Buyer's designees. Nothing expressed or referred to in this Agreement will be construed to give any Person, other than the parties to this Agreement, any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement, except such rights as may inure to a successor or permitted assignee under this <u>Section 9.7</u>.

9.8    **Amendment and Modification; Waiver**. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or Default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

9.9    **Governing Law; Submission to Jurisdiction; Waiver of Jury Trial**.

(a)    THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING AS TO MATTERS OF CONSTRUCTION, VALIDITY, AND PERFORMANCE.

     (b)     BUYER AND SELLER AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (i) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT AND (ii) THE PURCHASED ASSETS AND ASSUMED LIABILITIES, AND SELLER AND BUYER EXPRESSLY CONSENT TO AND AGREE NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY ANCILLARY DOCUMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY.

     9.10   **Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

DM3\8893399.1

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLER:**

HAMON RESEARCH-COTTRELL, INC.

By: _____
Name:
Title:

**BUYER:**

THE BABCOCK & WILCOX COMPANY

By: _____
Name:
Title:

32

**EXHIBIT A**

**FORM OF BILL OF SALE**

This BILL OF SALE (this "Bill of Sale"), is executed and delivered as of [_____ __], 2022, by Hamon Research-Cottrell, Inc., a Delaware corporation ("Seller") for the benefit of The Babcock & Wilcox Company, a Delaware corporation ("Buyer").

WHEREAS, on the terms and subject to the conditions of the Asset Purchase Agreement, dated as of July 27, 2022, by and between Seller and Buyer (as modified, amended, or supplemented, the "Asset Purchase Agreement"), Seller agreed to, on the Closing Date, sell, convey, transfer, assign, and deliver to Buyer the Purchased Assets free and clear of all Encumbrances.

NOW, THEREFORE, for the consideration set forth in the Asset Purchase Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged:

1.      Defined Terms. All initially capitalized terms used but not defined herein have the meaning ascribed to such terms in the Asset Purchase Agreement.

2.      Transfer of Purchased Assets. On the terms and subject to the conditions set forth in the Asset Purchase Agreement, Seller hereby sells, conveys, transfers, assigns, and delivers to Buyer, and Buyer's successors and assigns, all of the right, title, and interest of Seller in and to the Purchased Assets owned by Seller free and clear of all Encumbrances.

3.      Further Assurances. If Buyer shall consider or be advised that any deeds, bills of sale, instruments of conveyance, assignments, assurances, or any other actions or things are necessary or desirable to vest, perfect, or confirm ownership (of record or otherwise) in Buyer, Buyer's right, title, or interest in, to, or under any or all of the Purchased Assets transferred and conveyed by Seller hereunder, Seller shall execute and deliver all deeds, bills of sale, instruments of conveyance, powers of attorney, assignments, and assurances and take and do all such other actions and things as may be reasonably requested by Buyer in order to vest, perfect, or confirm any and all right, title, and interest in, to, and under such rights, properties, or assets in Buyer, in each case at Buyer's cost and expense.

4.      Binding on Successors; No Third-Party Beneficiaries. This Bill of Sale shall be binding upon and inure to the benefit of the parties hereto and the successors in interest and permitted assigns of such parties. This Bill of Sale is not intended to confer any rights or remedies upon any Person other than the parties hereto.

5.      Counterparts. This Bill of Sale may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument. A manual signature on this Bill of Sale or other documents to be delivered pursuant to this Bill of Sale, an image of which shall have been transmitted electronically, will constitute an original signature for all purposes. The delivery of copies of this Bill of Sale or other documents to be delivered pursuant to this Bill of Sale, including executed signature pages where required,

by electronic transmission will constitute effective delivery of this Bill of Sale or such other document for all purposes.

6. <u>Governing Law</u>.    THIS BILL OF SALE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED THIS BILL OF SALE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING AS TO MATTERS OF CONSTRUCTION, VALIDITY, AND PERFORMANCE.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Seller has executed this Bill of Sale as of the day and year first above written.

**SELLER:**
HAMON RESEARCH-COTTRELL, INC.

By:_____
Name: _____
Title: _____

*[Signature page to Bill of Sale]*

**EXHIBIT B**

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

This ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is executed and delivered as of [_____ ], 2022, by and between HAMON RESEARCH-COTTRELL, INC., a Delaware corporation ("Seller"), as debtor and debtor-in-possession, to THE BABCOCK & WILCOX COMPANY, a Delaware corporation ("Buyer"), pursuant to the Asset Purchase Agreement (as hereinafter defined).

WHEREAS, on the terms and subject to the conditions of the Asset Purchase Agreement, dated as of July 27, 2022, by and between Buyer and Seller (as modified, amended, or supplemented, the "Asset Purchase Agreement"), Seller agreed to, on the Closing Date, sell, convey, transfer, assign, and deliver to Buyer the Purchased Assets free and clear of all Encumbrances.

NOW, THEREFORE, for the consideration set forth in the Asset Purchase Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

1.    Defined Terms.  All initially capitalized terms used but not defined herein have the meaning given them in the Asset Purchase Agreement.

2.    Assignment of Assigned Contracts.  On the terms and subject to the conditions set forth in the Asset Purchase Agreement, Seller hereby sells, conveys, transfers, assigns, and delivers to Buyer, and Buyer's successors and assigns, all right, title and interest of Seller in and to the Assigned Contracts set forth on attached Schedule A.

3.    Assumption of Assumed Liabilities.  On the terms and subject to the conditions set forth in the Asset Purchase Agreement, hereby assumes and agrees to discharge or perform when due (in accordance with the respective terms and subject to the respective conditions of the Assigned Contracts in the case of the Assigned Contracts), solely the Assigned Contracts and the Assumed Liabilities. Other than pursuant to the foregoing sentence, Buyer has not assumed, is not assuming and will not be deemed to have assumed any other Liability of any nature or kind whatsoever of Seller.

4.    Binding on Successors; No Third-Party Beneficiaries.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and the respective successors in interest and permitted assigns of such parties.  This Agreement is not intended to confer any rights or remedies upon any person or entity other than the parties hereto.

5.    Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.  A manual signature on this Agreement or other documents to be delivered pursuant to this Agreement, an image of which shall have been transmitted electronically, will constitute an original signature for all purposes.  The delivery of copies of this Agreement or other documents to be delivered pursuant to this Agreement, including executed signature pages where required, by

electronic transmission will constitute effective delivery of this Agreement or such other document for all purposes.

      6.  <u>Governing Law</u>.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING AS TO MATTERS OF CONSTRUCTION, VALIDITY, AND PERFORMANCE.

[SIGNATURE PAGE FOLLOWS]

DM3\8893399.1

IN WITNESS WHEREOF, the undersigned hereby execute this Assignment and Assumption Agreement the day and year first above written.

**BUYER:**
THE BABCOCK & WILCOX COMPANY


By:_____
Name: _____
Title: _____


**SELLER:**
HAMON RESEARCH-COTTRELL, INC.


By:_____
Name: _____
Title: _____

*[Signature page to Assignment and Assumption Agreement]*

**Schedule 2.1(a)[1]**
**Purchased Inventory**

See attached.[2]

---

[1] Note to Seller:  All disclosure schedules enclosed herein are based upon Buyer's diligence to date and the materials available in the data room.  As such, these schedules are subject to change and update and will require certain updates from Seller, including as specifically annotated in the relevant footnotes included herein.

[2] Note to Seller:  File 4.4.3.1.1 HRC Inventory_7122022 from the virtual data room. Please confirm this is a complete inventory listing and update as necessary.

1



2



DM3\8893399.1



4



DM3\8893399.1



DM3\8893399.1

DMFS\893399.1



8

**Schedule 2.1(d)**
**Purchased Real Property**

None.

**Schedule 4.5**
**Existing Insurance Policies**

| HAMON CORPORATION - POLICY SCHEDULE - $100K ANNUAL FEE - 1/1/2022 - 1/1/2023 TERM | | | | |
|---|---|---|---|---|
| Line of Business | Policy Number | Carrier | Effective Date | Expiration Date |
| AUTO | 13UENJP7869 | HARTFORD | 1/1/2022 | 1/1/2023 |
| GENERAL LIABILITY | HJEXGL4299L289TIL22 | TRAVELERS | 1/1/2022 | 1/1/2023 |
| UMBRELLA | CUP3K99037422NA | TRAVELERS | 1/1/2022 | 1/1/2023 |
| POLLUTION/PROFESSIONAL | ZPP31N2531422A | TRAVELERS | 1/1/2022 | 1/1/2023 |
| INLAND MARINE/ CONTRACTORS EQUIPMEN | MKLM1IM0000335 | MARKEL | 1/1/2022 | 1/1/2023 |
| FOREIGN PACKAGE | PHFD38294945 009 | ACE/CHUBB | 1/1/2022 | 1/1/2023 |
| PROPERTY | CPD5632102 | TRAVELERS | 1/1/2022 | 1/1/2023 |
| KIDNAP & RANDSOM | UKA30116097.20 | HISCOX | 6/13/2020 | 6/13/2023 |
| MANAGEMENT LIABILITY (D&O/EPL/FID/CRI | PCD1002860-01 | ARCH | 6/13/2021 | 6/13/2022 |
| EMPLOYED LAWYERS | 6804-5236 | ACE/CHUBB | 6/13/2021 | 6/13/2022 |
| MARINE CARGO | OC260427 | C N A | 7/1/2021 | 7/1/2022 |
| WORKERS COMP | 1000003818 | STARR | 8/15/2021 | 8/15/2022 |
| WORKERS COMP | 1000003820 | STARR | 8/15/2021 | 8/15/2022 |
| WORKERS COMP | 1000003819 | STARR | 8/15/2021 | 8/15/2022 |
| | | | | |
| UNMANNED AIRCRAFT (DRONE) | 9027467 | GLOBAL AEROSPACE | 3/19/2021 | 3/19/2022 |

3

---

[3] Note to Seller: Confirm that the insurance policies provided for Hamon Corporation are in effect for HRC.

10

**Schedule 4.8**
**Purchased Intellectual Property**

Registered Trademarks:

| Case Number | Trademark | Country | Application No. | Filing Date | Registration No. | Registration Date | Status | Owner Name |
|---|---|---|---|---|---|---|---|---|
| 157584-00061 | HAMON RESEARCH-COTTRELL | Argentina | 3655521 | 27-Oct-2017 | 3024741 | 24-Sep-2019 | Registered | Hamon Research-Cottrell Inc. |
| 157584-00083 | HAMON RESEARCH-COTTRELL | Argentina | 3655522 | 27-Oct-2017 | 3024742 | 24-Sep-2019 | Registered | Hamon Research-Cottrell, Inc. |
| 157584-00084 | HAMON RESEARCH-COTTRELL | Argentina | 3655523 | 27-Oct-2017 | 3024749 | 24-Sep-2019 | Registered | Hamon Research-Cottrell, Inc. |
| 157584-00062 | HAMON RESEARCH-COTTRELL | Chile | 1270239 | 23-Oct-2017 | 1291149 | 06-Feb-2019 | Registered | Hamon Research-Cottrell, Inc. |
| 157584-00090 | HAMON RESEARCH-COTTRELL | Colombia/WO | 1377379 | 20-Oct-2017 | 598384 | 20-Oct-2017 | Registered | Hamon Research-Cottrell, Inc. |
| 157584-00063 | HAMON RESEARCH-COTTRELL | Peru | 000725527-2017 | 25-Oct-2017 | T00019275 | 17-Jan-2018 | Registered | Hamon Research-Cottrell, Inc. |
| 157584-00060 | HAMON RESEARCH-COTTRELL | United States of America | 87/428,772 | 27-Apr-2017 | 5410888 | 27-Feb-2018 | Registered | Hamon Research-Cottrell, Inc. |
| 157584-00016 | MIGI | US | 74034538 | 02-Mar-1990 | 1622092 | 13-Nov-1990 | Registered | Hamon Research-Cottrell Inc. |

| Case Number | Trademark | Country | Application No. | Filing Date | Registration No. | Registration Date | Status | Owner Name |
|---|---|---|---|---|---|---|---|---|
| 157584-00019 | RESEARCH-COTTRELL | US | 86754910 | 11-Sep-2015 | 5234694 | 04-Jul-2017 | Registered | HAMON & CIE S.A. |

11

DM3\8893399.1

**Schedule 6.13**
**Contract & Cure Schedule**

1.  Thermal DeNOx Process License and Sublicensing Agreement by and between ExxonMobil Research and Engineering Company and Hamon Research-Cottrell, Inc. dated August 1, 2002, as amended by that Amendment No. 1 dated April 9, 2003.

2.  Wet Gas Scrubbing Process License and Sublicensing Agreement by and between ExxonMobil Research and Engineering Company and Hamon Research-Cottrell, Inc. dated January 1, 2003, as amended by that Amendment No. 1 dated April 9, 2003, Amendment No. 2 dated August 13, 2012, Amendment No. 3 dated February 27, 2015, and Fourth Amendment dated June 15, 2016.

3.  Ammonia Generation Technology License Agreement by and between EC&C Technologies, Inc. and Hamon Research-Cottrell, Inc. dated January 31, 2001, as amended by that First Amendment dated September 1, 2002 and Second Amendment dated July 1, 2007.

4.  ReACT Activated Coke Process (REACT) License Agreement by and between J-POWER EnTech, Inc. and Hamon Research-Cottrell, Inc. dated October 12, 2009, as amended by that Amendment dated April 16, 2015 and Second Amendment dated May 31, 2016.

5.  Independent Contractor Agreement (ICA-DAC1-418005-00472-900007) by and between Worley Group Inc. and Hamon Research-Cottrell, Inc. dated March 10, 2022, as amended by that Revision 1 dated May 11, 2022.

## Schedule 7.2(e)
## Trademarks to be Assigned

| Case Number | Trademark | Country | Application No. | Filing Date | Registration No. | Registration Date | Status | Owner Name |
|---|---|---|---|---|---|---|---|---|
| 157584-00061 | HAMON RESEARCH-COTTRELL | Argentina | 3655521 | 27-Oct-2017 | 3024741 | 24-Sep-2019 | Registered | Hamon Research-Cottrell Inc. |
| 157584-00083 | HAMON RESEARCH-COTTRELL | Argentina | 3655522 | 27-Oct-2017 | 3024742 | 24-Sep-2019 | Registered | Hamon Research-Cottrell, Inc. |
| 157584-00084 | HAMON RESEARCH-COTTRELL | Argentina | 3655523 | 27-Oct-2017 | 3024749 | 24-Sep-2019 | Registered | Hamon Research-Cottrell, Inc. |
| 157584-00062 | HAMON RESEARCH-COTTRELL | Chile | 1270239 | 23-Oct-2017 | 1291149 | 06-Feb-2019 | Registered | Hamon Research-Cottrell, Inc. |
| 157584-00090 | HAMON RESEARCH-COTTRELL | Colombia/WO | 1377379 | 20-Oct-2017 | 598384 | 20-Oct-2017 | Registered | Hamon Research-Cottrell, Inc. |
| 157584-00063 | HAMON RESEARCH-COTTRELL | Peru | 000725527-2017 | 25-Oct-2017 | T00019275 | 17-Jan-2018 | Registered | Hamon Research-Cottrell, Inc. |
| 157584-00060 | HAMON RESEARCH-COTTRELL | United States of America | 87/428,772 | 27-Apr-2017 | 5410888 | 27-Feb-2018 | Registered | Hamon Research-Cottrell, Inc. |
| 157584-00016 | MIGI | US | 74034538 | 02-Mar-1990 | 1622092 | 13-Nov-1990 | Registered | Hamon Research-Cottrell Inc. |

| Case Number | Trademark | Country | Application No. | Filing Date | Registration No. | Registration Date | Status | Owner Name |
|---|---|---|---|---|---|---|---|---|
| 157584-00019 | RESEARCH-COTTRELL | US | 86754910 | 11-Sep-2015 | 5234694 | 04-Jul-2017 | Registered | HAMON & CIE S.A. |